**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000572
29-MAY-2015
08:15 AM**

NO. CAAP-12-0000572

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

TREMAINE M.K.K. LUI-DYBALL, Plaintiff-Appellant, v.
HAWAIIAN HOMES COMMISSION, Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 11-1-1031)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, Leonard and Reifurth, JJ.)

Plaintiff-Appellant Tremaine M.K.K. Lui-Dyball (**Lui-Dyball**) appeals from the Circuit Court of the First Circuit's (**Circuit Court's**) May 8, 2012 Final Judgment (**Judgment**) and challenges the Circuit Court's April 17, 2012 Order Affirming the Hawaiian Homes Commission's (the **Commission's**) Rulings on Objections and Order Denying Reconsideration and Affirming February 14, 2011 Findings of Fact, Conclusions of Law and Decision and Order Filed April 25, 2011 (**Order**).[1] This secondary appeal arises from the Commission's decision to cancel Lui-Dyball's lease to a residential homestead lot based on a purported lease violation. For the reasons set forth herein, we reverse the cancellation of Lui-Dyball's lease.

---

[1] The Honorable Rhonda A. Nishimura presided.

I.    BACKGROUND

A.    Relevant Facts

On June 2, 1973, Lui-Dyball succeeded to an interest in Department of Hawaiian Homelands (**DHHL**) Residential Lot Lease No. 3913 (the **Lease**) for a homestead property at 41-1010 Kalanianaole Highway, Waimanalo, Hawai'i 96795 (the **Property**). The fourth paragraph (**Paragraph 4**) of the "terms, covenants and conditions" section of the Lease document states, in relevant part:

> The Homesteader will, at his own expense, at all times, . . . keep the demised premises and all improvements thereon in a strictly clean, sanitary and orderly condition; and will observe, perform and comply with all laws, ordinances, rules and regulations of the health or other governmental authorities, including the rules and regulations of the Commission, applicable to the use and occupation of said demised premises as may from time to time be issued, enacted or promulgated; and will allow the Commission and its agents at all reasonable times free access to the demised premises for the purpose of examining the same and determining whether the covenants herein and elsewhere in this lease contained are being fully observed and performed.

The sixth paragraph of the "terms, covenants and conditions" section of the Lease document states, in relevant part:

> This lease is upon the continuing condition that if the Homesteader shall . . . fail in any other respect faithfully to observe or perform any condition or covenant in this lease contained and on his part to be observed or performed, or fail to observe or perform the conditions and obligations imposed upon said Homesteader by the terms of the Act to which this lease has been made expressly subject, the Commission may declare the interest of the Homesteader in the lands demised hereunder and all improvements thereon to be forfeited and this lease in respect thereto cancelled, and shall thereupon order said lands to be vacated within a reasonable time.

On July 14, 2006, officers from the Honolulu Police Department (**HPD**) conducted a "raid" at the Property and arrested Lui-Dyball's son Jerald Lee (**Jerald**) for "stolen property and drug paraphernalia." Lui-Dyball was out of town at the time.

On September 27, 2007, Officer John Peiper (**Peiper**) of DHHL's Enforcement Unit visited the Property in response to two anonymous complaints. While on the Property, Peiper informed Lui-Dyball that there had been complaints of drinking and drug use on the Property; Lui-Dyball denied that any drug use was

occurring. Peiper issued to Lui-Dyball a written Notice of Lease Violation, stating:

> THIS NOTICE IS TO INFORM YOU that you are in violation of your lease agreement for lot 5, TMK: 4-1-021-026 the property located at the following address: 41-1010 KALANI HWY.
>
> The violation/s are: ILLEGAL SLEEPING QUARTER, 8x40' TRAILER, 15'x15' METAL SIDING AND BLUE TARP TENT, 12'x12' TENT, LOCATED REAR OF MAIN STRUCTURE (HOME)
>
> NOTICE IS HEREBY GIVEN that you are to take corrective action and do the following: REMOVING THE TWO TENTS AS LIVING QUARTERS, REMAIN [sic] FROM USING TRAILER AS SLEEPING QUARTERS
>
> This corrective action must be completed by: DEC. 27, 2007, 12:00 P.M.
>
> FURTHER NOTICE IS GIVEN: that should you fail to correct the discrepancies within the time frame recorded above, you may be subject to an Administrative Review to have your lease cancelled.

On December 17, 2008, HPD officers executed a narcotics search warrant for the Property, a trailer on the Property, and the person of Jerald's then-girlfriend Bobbie Jo Friel (**Friel**). HPD officers arrested Friel and five other individuals on the Property for "Promoting a Dangerous Drug in the Third Degree, Drug Paraphernalia." The items confiscated during the search included plastic bags, a cut straw, glass pipes, and two gram scales containing residue resembling crystal methamphetamine. Lui-Dyball was not present at the Property during the incident.

B.  Procedural History

At the Commission's June 23, 2009 regular meeting, the Commission received a request for a contested case hearing regarding Lui-Dyball's alleged lease violation.

On August 6, 2009, Lui-Dyball sent a letter to Micah Kane, Chairman of DHHL, which stated, in relevant part:

> My son, Jerald, was living out of his car (by his choice) after his divorce. I was out of town when a raid was conducted at my Waimanalo home by HPD. Jerald was arrested on July 14, 2006 of stolen property and drug paraphernalia. He has done his time in prison and is now in treatment at Ho'omau Keola in Makaha. He says he has truly learned his lesson and never wants to go backwards.
>     Because of his arrest, the ownership of my home at 41-1010 Kalanianaole Hwy is now in jeopardy. I am awaiting a

> hearing from the DHHL enforcement office. I've [sic]
> haven't received any paperwork or any formal charges. I'd
> like to know what's going on. Can you please help me?

A September 4, 2009 letter from the Commission responded to Lui-Dyball's August 6, 2009 letter, stating that a DHHL Enforcement Officer was "currently reviewing police reports from the latest raid at [Lui-Dyball's] homestead address in December 2008, and upon completion [would] be notifying [her] in writing of further action, which may include a contested case hearing for lease violations."

An August 2, 2010 letter from the Commission informed Lui-Dyball that a contested case hearing before a Commission Hearings Officer had been scheduled for August 25, 2010. Attached to the letter were a "Notice of Hearing," a "Statement of Questions Presented," and a "Preliminary Statement of Alleged Facts." The questions presented in the Statement of Questions Presented were:

> 1. Are you in violation of paragraph 4 of lease no. 3913?
>
> 2. If you are found to be in violation of your department of Hawaiian Homes Commission Residence Lot Lease No. 3913 and the Hawaiian Homes Commission Act, 1920, as amended to your lease violation, should the Commission declare Lease No. 3913 TO BE CANCELED and your interest in Residential Lot No. 5 situated at Waimanalo, Oahu, Hawai'i and all improvements thereon to be forfeited in accordance with Sections 210 and 216, as applicable, of the Hawaiian Homes Commission Act, 1920 as amended?

The Preliminary Statement of Alleged Facts stated the following:

> LEASE VIOLATION: VIOLATION OF HAWAIIAN HOMES COMMISSION RESIDENCE LOT LEASE NO. 3913
>
> 1. Paragraph 4 of Hawaiian Homes Commission Residence Lot Lease No. 3913 states, "The Homesteader will, at his own expense, at all times, well and substantially repair, maintain, amend and keep all buildings and improvements now or hereafter erected or constructed on the demised premises with all necessary reparations and amendments whatsoever; and will keep the demised premises and all improvements thereon in a strictly clean, sanitary and orderly condition; and will observe, perform and comply with all laws, ordinances, rules and regulations of the health or other governmental authorities, including the rules and regulations of the Commission, applicable to the use and occupation of said demised premises as may from time to time be issued, enacted or promulgated; and will allow the Commission and its agents at all reasonable times free access to the demised premises for the purpose of examining

4

> the same and determining whether the covenants herein and elsewhere in this lease contained are being fully observed and performed."

(Italics omitted.)

On August 25, 2010, Lui-Dyball attended a contested case hearing before Hearings Officer Richard L. Hoke (**Hoke**). Lui-Dyball orally waived her right to an attorney at this hearing. During the hearing, Lui-Dyball testified to the following: (1) Friel did not "live" on the Property in December 2008 and "ha[d] her own address in Kaneohe"; (2) Friel had visited Jerald "[m]any times" at the Property; (3) Lui-Dyball was aware that Friel had a drug problem in December 2008; (4) Lui-Dyball did not know two of the other five people who were arrested during the December 17, 2008 raid, and the three people Lui-Dyball did recognize did not live on the Property at the time; (5) Lui-Dyball was aware that Jerald had been arrested on the Property on July 14, 2006 for possession of stolen property and drug paraphernalia; and (6) Peiper informed Lui-Dyball during his visit on September 27, 2007 that there had been complaints of drug use on the Property, but Lui-Dyball had told Peiper that there was no drug use occurring.

On October 22, 2010, Hoke issued the Hearings Officer's Findings of Fact, Conclusions of Law and Recommended Order. Conclusion of Law (**COL**) 6 stated:

> 6. Lessee violated Residence Lot Lease No. 3913 for failure to observe and comply with all laws of the State of Hawaii while occupying her homestead lot, particular[ly] the drug and paraphernalia laws of the State of Hawaii.

COL 10 stated:

> 10. Lessee had constructive possession of the drugs and contraband recovered from on her property inasmuch that Peiper had informed her prior to the warranted search that drug activities were occurring on her property. Furthermore, Lessee was aware that her son, Jerald and his girlfriend, Friel, had drug problems and often frequented Lessee's property.

COL 11 stated that "DHHL is entitled to cancel Lessee's lease and to forfeit Lessee's rights therein." The Recommended Order recommended that the Commission grant DHHL's request to do so.

On January 24, 2011, the Commission held a hearing, which Lui-Dyball attended, represented by counsel.

On February 14, 2011, the Commission entered its Findings of Fact, Conclusions of Law and Decision and Order (**Decision and Order**). Findings of Fact (**FOFs**) 2, 4, 5, and 6 stated:

> 2. The Respondent/Lessee filed a written Respondent's Statement in Support of Retaining the Lease for Hearing on January 24, 2011 with the Commission on January 24, 2011.
>
> . . .
>
> 4. The Respondent/Lessee knew or should have known that illegal activities were occurring on the homestead lot demised under her lease.
>
> 5. While she asserts that she does not permit illegal activities to be conducted on her lot, the Respondent/Lessee has not taken steps to prevent such occurrences from happening.
>
> 6. It is unlikely that Respondent/Lessee will be able to prevent illegal activities from occurring on the homestead lot in the future.

On February 28, 2011, Lui-Dyball filed a Petition for Reconsideration of Commission's Decision and Order filed on February 14, 2011. The petition challenged the Commission's FOFs 2, 4, 5, and 6. Specifically, Lui-Dyball challenged FOF 4 and the Hearings Officer's Conclusion of Law 10 regarding "constructive possession." She argued that "the mere fact that Officer Peiper 'had informed' [Lui-Dyball] 'that drug activities were occurring on her property' does not establish that [Lui-Dyball] had any knowledge of illegal activity." Objecting to FOFs 5 and 6, Lui-Dyball highlighted her efforts to prevent any future illegal activity on the Property.

The Commission held a reconsideration hearing on March 21, 2011. During the hearing, Lui-Dyball offered to present two witnesses who would testify on Lui-Dyball's behalf that she was not aware of the illegal activity occurring on the Property. The Commissioners declined to hear testimony of the witnesses.

On April 25, 2011, the Commission entered its Rulings on Objections and Order Denying Reconsideration and Affirming

February 14, 2011 Findings of Fact, Conclusions of Law and Decision and Order (**Rulings**). Rulings on Objections 3 and 4 stated:

> 3. The Commission did not base its decision to cancel the Respondent/Lessee's lease on the hearing officer's COL 10 (Statement, page 3, para. 2 and Petition, pages 2,3). As such, the Commission finds the Respondent/Lessee's objection to the hearing officer's COL 10 without merit. Nonetheless, the Respondent/Lessee's reliance on §701-114, Hawai'i Revised Statutes ("HRS"), is erroneous in that §701-114, HRS, relates to the burden of proof in criminal matters. This contested case hearing is brought pursuant to Chapter 91, HRS. Section 91-10, HRS, establishes that the burden of proof in matters such as this is "by a preponderance of the evidence," (" . . . The degree or quantum of proof shall be a preponderance of the evidence." §91-10(5), HRS), not "beyond a reasonable doubt."

> 4. The Commission did not, and does not now, find that the Respondent/Lessee condones drug use on her lot (Statement, page 4, para 3). The Commission does find, however, based upon the credible evidence, that the Respondent/Lessee has not taken satisfactory steps to prevent illegal activities from occurring on the premises demised under Lease No. 3913 and finds it unlikely that she will prevent such activity in the future.

FOF 9 stated: "There were illegal drugs found on the premises demised under Lease No. 3913 on or about December 2008."

On May 23, 2011, Lui-Dyball appealed to the Circuit Court. In her opening brief to the Circuit Court, Lui-Dyball argued that the Commission had "adopted a 'zero' tolerance policy on drugs[,]" and that

> [i]nstead of going through all the rigmarole of adopting rules on the matter, the Commission has instead opted to implement its policy by identifying Homesteaders in violation of that policy and canceling their leases through contested case hearings.

Lui-Dyball also argued that: (1) she was denied due process of law because the Commission failed to provide proper notice regarding the contested case hearing; (2) the Commission was arbitrary in cancelling the Lease "when the DHHL never alleged that she herself failed to comply with any law of the State or any rule promulgated by the Commission, but rather found that she violated the Commission's 'zero tolerance' policy by failing to adequately police her property so that others would not have drug paraphernalia there in her absence[;]" and (3) Hoke's COL 10 was clearly erroneous.

In its answering brief to the Circuit Court, the Commission argued:  (1) "[d]espite her arguments to the contrary, there is ample evidence in the record that Lui-Dyball was aware of prior drug activity on the [Property].";  (2) Lui-Dyball had a duty to control the actions of those she allowed on the Property; (3) the Commission's practices regarding drug use on Hawaiian Homelands were an exercise of its adjudicatory powers, not a "policy" requiring formal rulemaking; (4) Lui-Dyball waived her objection to the Commission's purported "policy" when she failed to raise any objections at the contested case hearing, the Commission hearing, or the Commission hearing on reconsideration; (5) Lui-Dyball waived her procedural due process claim by failing to raise any objections at the contested case hearing, the Commission hearing, or the Commission hearing on reconsideration; and (6) DHHL's failure to issue a detailed complaint constituted harmless error, not a due process violation.

In reply, Lui-Dyball:  (1) argued that she did not violate Paragraph 4 of the Lease; (2) distinguished the Commission from the Hawai'i Public Housing Authority, to which the Commission analogized itself in its answering brief, in that the Hawai'i Public Housing Authority "has rules that allow the eviction of the tenant when household members or guests use drugs on the premises[;]" and (3) argued that "it appears that [the Commission] and the Attorney General serve grossly insufficient notice by design."

The Circuit Court affirmed the Commission's April 25, 2011 Rulings, entering the Order on April 17, 2012 and the Judgment on May 8, 2012.  Lui-Dyball timely filed a Notice of Appeal on June 7, 2012.

II.  POINTS OF ERROR

Lui-Dyball raises fourteen points of error on appeal:

(1)  The Hearings Officer's COL 10 is wrong and clearly erroneous;

8

(2) HRS § 91-10 (2012) was violated when Akana misstated Peiper's written documentation of Peiper's September 27, 2007 visit to the Property during the Commission's hearing on reconsideration;

(3) The Commission's FOF 4 is clearly erroneous;

(4) The Commission's FOF 5 is clearly erroneous;

(5) The Commission's FOF 6 is not a factual finding, but rather speculation about future events;

(6) The Commission's FOF 9 on reconsideration is clearly erroneous;

(7) The Commission acted arbitrarily, without jurisdiction, and in violation of due process when it approved a contested case hearing without a signed complaint containing a short and simple statement of the facts as required by HAR § 10-5-31;

(8) The Notice of Hearing served on Lui-Dyball failed to allege the facts that she would be confronted with at the contested case hearing as required by HRS § 91-9(b)(4) in violation of due process;

(9) The Commission acted arbitrarily when it cancelled Lui-Dyball's lease;

(10) The Circuit Court erred when it held that "Paragraph 4 of [Lui-Dyball's] lease requires not only [Lui-Dyball], but also those that she allows on her premises, to comply with all laws enacted by governmental authorities.";

(11) The Commission violated the Hawaii Administrative Procedures Act, HRS Chapter 91, by cancelling Lui-Dyball's lease based on policies that are not formalized into administrative rules;

(12) The hearing on reconsideration was unfair, violative of HRS §§ 91-9(c) (2012) and 91-10(c), and contrary to due process of law because while Lui-Dyball and Akana were allowed to testify, Lui-Dyball's witnesses, who would have rebutted Akana's testimony, were not;

(13) The Commission violated HRS § 91-9(g) when it considered matters beyond the record (prior hearing decisions).

Lui-Dyball was unable to obtain those prior hearing decisions even though HRS § 92F-12(a)(2) requires that they be "available for public inspection and duplication during regular business hours"; and

(14) The Circuit Court erred in affirming the Commission's Rulings.

III. APPLICABLE STANDARDS OF REVIEW

The review of a circuit court's decision upon its review of an agency's decision is a secondary appeal. Haw. Teamsters & Allied Workers, Local 966 v. Dep't of Labor & Indus. Relations, 110 Hawai'i 259, 265, 132 P.3d 368, 374 (2006). In a secondary appeal, "'Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court.'" AlohaCare v. Ito, 126 Hawai'i 326, 341, 271 P.3d 621, 636 (2012) (quoting Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations, 70 Haw. 72, 80, 762 P.2d 796, 800-01 (1988)). The applicable standard of review for administrative appeals is set forth in HRS § 91-14(g) (1993), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

See also AlohaCare, 126 Hawai'i at 341, 271 P.3d at 636 (applying HRS § 91-14(g) when evaluating a petition seeking a declaratory ruling under HAR § 16-201-48). "[U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) (alterations in original) (quoting In re Hawaiian Elec. Co., 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996)).

Dist. Council 50, of Int'l Union of Painters and Allied Trades v. Lopez, 129 Hawai'i 281, 286-87, 298 P.3d 1045, 1050-51 (2013) (footnotes omitted).

Pursuant to HRS § 91-14(g)(5), administrative findings of fact are reviewed under the clearly erroneous standard,

which requires [the appellate] court to sustain its findings unless the court is left with a firm and definite conviction that a mistake has been made. Administrative conclusions of law, however, are reviewed under the de novo standard inasmuch as they are not binding on an appellate court. Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency. To be granted deference, however, the agency's decision must be consistent with the legislative purpose.

AlohaCare v. Ito, 126 Hawaiʻi 326, 341, 271 P.3d 621, 636 (2012) (block quotation format altered) (citing Peroutka v. Cronin, 117 Hawaiʻi 323, 326, 179 P.3d 1050, 1053 (2008)). "Questions of statutory interpretation are questions of law reviewable de novo." Id. (citation and internal quotation marks omitted).

IV. DISCUSSION

Lui-Dyball argues in her ninth point of error that the Commission acted arbitrarily when it cancelled the Lease. For the reasons that follow, we hold that Hearings Officer's COL 6 stating that Lui-Dyball had violated the Lease and COL 11 stating that DHHL was entitled to cancel the Lease, both of which the Commission adopted and incorporated by reference in its Decision and Order, were wrong. Thus, the Commission acted arbitrarily and abused its discretion when it cancelled the Lease. See Dist. Council 50, 129 Hawaiʻi at 286-87, 298 P.3d at 1050-51.

Lui-Dyball argues in her tenth point of error that "[t]he Circuit Court erred when it held that 'Paragraph 4 of [Lui-Dyball's] lease requires not only [Lui-Dyball], but also those that she allows on her premises, to comply with all laws enacted by governmental authorities.'" We hold that the Circuit Court's finding was "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record" and that the Circuit Court's decision to affirm the Commission's cancellation of the Lease in reliance on this finding was wrong. Id. at 286-87, 298 P.3d at 1050-51.

To support its argument that Lui-Dyball was in violation of Paragraph 4 of the Lease, the Commission relies on

Spence v. Gormley, 439 N.E.2d 741 (Mass. 1982),[2] a consolidated
case in which two tenants were evicted from Boston public housing
after their sons participated in racially-motivated firebombings,
and Williams v. Haw. Hous. Auth., 5 Haw. App. 325, 690 P.2d 285
(1984), in which tenants were evicted from Hawai'i public housing
following several violent incidents involving their sons. The
instant case is distinguishable from Spence and Williams because
the language of the leases in both of those cases provided that
permitting third party guests or household members to engage in
prohibited conduct while on the premises constituted a violation
of the lease that could result in cancellation.

> The lease in Spence
>
> identif[ied] ten permissible grounds for termination of the
> tenancy by the BHA, three of which bear upon the present
> cases. "This lease may be terminated by the [BHA] . . . for
> no reason other than . . . 2. Reasonable likelihood of
> serious repeated interference with the rights of other
> tenants. . . . 5. Creation or maintenance of a serious
> threat to the health or safety of other tenants. . . . 10.
> In the event of a violation by the Tenant of any of the
> terms, conditions or covenants of this lease." In addition,
> the lease specifies "tenant obligations," including an
> agreement to "[l]ive in a peaceful way, respecting the
> rights of his neighbors to privacy and quiet."

Spence, 439 N.E.2d at 744. The tenants argued "that their leases
[did] not authorize termination on the basis of acts by anyone
other than the tenants named in the lease." Id. at 743.
However, the court interpreted the lease terms to permit
termination as a result of prohibited conduct by household
members other than the named tenant:

> The more important question is whether the termination
> provisions cover conduct by household members other than the
> named tenant who has signed the lease. We believe they do.
> The language of the termination provisions speaks only of
> the facts that justify eviction—a threat to health and
> safety or a likelihood of interference with rights. This
> wording suggests that if these problems arise from the
> tenancy, eviction is warranted, whether the wrongdoer is the
> tenant or a member of her household. Moreover, an
> interpretation of the lease to cover the conduct of all
> household members is consistent with the manifest purpose of
> the termination provisions, to promote safety and order in

---

[2]    Holding limited on other grounds by Boston Hous. Auth. v. Garcia,
871 N.E.2d 1073 (Mass. 2007) (noting that the "special circumstances" defense
set forth in Spence was preempted by Dep't of Hous. & Urban Dev. v. Rucker,
535 U.S. 125, 122 S. Ct. 1230 (2002)).

the housing projects. . . .

> We stated in <u>Spence v. Reeder</u>, --- Mass. ---, --- ----, Mass. Adv. Sh. (1981) 229, 252-253, 416 N.E.2d 914, that at least when a tenant knows or has reason to know of a household member's violent tendencies, "[t]he notion that interference with or threats to the rights of other tenants justifying eviction can only come from a signatory of the lease (or his or her minor children) is itself illogical. Surely, a public housing authority cannot be left helpless to rectify a serious threat to the safety of other tenants simply because the signatory of the lease happens not to be the source of the threat." Although we were concerned in <u>Spence</u>, not with construction of a lease, but with general questions of fairness, our comments there are relevant to the likely intent of parties seeking to provide rationally for a means to curtail rampant violence in the housing projects.

<u>Id.</u> at 744 (footnote omitted).

The Intermediate Court of Appeals (**ICA**) cited the reasoning of the <u>Spence</u> court with approval in <u>Williams</u>. <u>Williams</u>, 5 Haw. App. at 333-34, 690 P.2d at 291-92. In that case, the relevant lease provided:

> 9. TENANT'S OBLIGATIONS: Tenant shall, at all times during the term of this Rental Agreement perform the following obligations:
>
> . . .
>
> (b) Not permit any person to occupy the dwelling unit other than the persons listed on the application of Tenant, without first obtaining Management's prior written consent;
>
> . . .
>
> (n) Conduct himself **and cause other persons who are on the premises with his consent to conduct themselves** in a manner which will not disturb his neighbors' peaceful enjoyment of their accommodations and will be conducive to maintaining the project in a decent, safe, and sanitary condition;

<u>Id.</u> at 326, 690 P.2d at 287 (emphasis added). The ICA held:

> Appellants were evicted not on account of the incidents <u>per se</u>, but because they failed to control the actions of their sons as evidenced by the long list of complaints, including the last two altercations.
> . . .
> Appellants focus on the fact that the stabbing was unanticipated and argue therefore that they should not be evicted for their son's act because they were not afforded an opportunity to rectify it. The argument completely misses the point.
> It is not the stabbing itself that is the basis of the eviction. Appellants were bound by paragraph 9(n) to control the actions of the family members living with them. They had been warned of their obligation and the agency's authority to evict. The last incident was only the proverbial straw on the camel's back.

Id. at 332-33, 690 P.2d at 290-91.[3]

In contrast, Lui-Dyball's Lease referred only to the "Homesteader" and contained no language stating that permitting third parties to violate the law on the Property constituted a violation of the Lease. The only basis the Commission cited for cancelling Lui-Dyball's lease was that she violated Paragraph 4. The Commission did not find that Lui-Dyball was involved in the alleged drug use or that she otherwise failed to "observe, perform and comply with all laws, ordinances, rules and regulations[.]" Thus, there were no grounds for cancelling the Lease, and the Commission acted arbitrarily in doing so.

We conclude that the Circuit Court's finding that Lui-Dyball violated Paragraph 4 was clearly erroneous, and thus the Circuit Court's Order and Judgment, which affirmed the Commission's April 25, 2011 Rulings based on that finding, must be reversed. In light of this holding, we need not reach Lui-Dyball's remaining points of error on appeal.

---

[3] The ICA also affirmed a Third Circuit Court's decision and order upholding the Commission's cancellation of a similar homestead lease in Rivera v. State, Dep't. Of Hawaiian Home Lands, No. CAAP-11-0000480, 2012 WL 3555486 (Haw. App. Aug. 16, 2012) (SDO). In that case, the Commission cancelled the lease after the lessee's husband was caught selling drugs on the property for a third time. Id. SDO at *1. The ICA held that although Rivera herself did not engage in illegal activity, she had nonetheless violated the lease provisions, and thus cancellation was proper. Id. SDO at *2.

Rivera is distinguishable from the instant case. The lease in Rivera, in addition to requiring the lessee to "comply with all of the requirements of all municipal, state and federal authorities and observe all municipal ordinances and state and federal statutes pertaining to said premises[,]" also prohibited the lessee from "permit[ting] to be committed any . . . unlawful use of the demised premises." Id. SDO at *1. Rejecting Rivera's argument that the Commission failed to prove that she herself was involved in or had any actual knowledge of the criminal activity, the ICA held that the circuit court did not err in concluding that the lease was properly cancelled on the basis that Rivera knew or should have known that her husband was engaging in the illegal activity on the property. Id. SDO at *2.

V.    CONCLUSION

Accordingly, the Circuit Court's Order and Judgment, and the Commission's April 25, 2011 Rulings, are reversed.

DATED: Honolulu, Hawai'i, May 29, 2015.

On the briefs:

Carl Foytik
for Plaintiff-Appellant

Diane K. Taira
S. Kalani Bush
Matthew S. Dvonch
Deputy Attorneys General
for Defendant-Appellee

Chief Judge

Associate Judge

Associate Judge